IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TAMMY S. ROBINSON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JO ANNE B. BARNHART, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | Civil Action No. 06-6 Erie |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

Plaintiff, Tammy S. Robinson, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. Robinson filed an application for DIB on December 5, 2002, alleging that she was disabled since August 26, 2002 due to herniated discs in her cervical spine, back pain, shoulder pain and leg discomfort (Administrative Record, hereinafter "AR", at 46-48; 56).[1] Her application was denied on April 11, 2003, and she requested an administrative hearing before an administrative law judge ("ALJ") (AR 27-31). A hearing was held on March 10, 2004 and following this hearing, the ALJ found that Robinson was not entitled to a period of disability or disability insurance benefits under the Act (AR 10-19; 247-271). Robinson's request for review by the Appeals Council was denied (AR 5-8), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons that follow, we will deny Plaintiff's motion and grant Defendant's motion.

---

[1] Robinson previously filed an application for DIB which was denied at the initial level on August 27, 1998 (AR 65).

## I. BACKGROUND

Robinson was born on December 19, 1954, and was forty-nine years old at the time of the ALJ's decision (AR 14, 46). She has a high school education, and past relevant work experience as a production and process control worker at a food processing plant (AR 57).

Prior to her alleged onset date of August 26, 2002, Robinson was injured in an automobile accident on December 6, 1997 (AR 155). On December 16, 1997, she began treatment with Joseph Thomas, M.D., for complaints of neck, back, shoulder and gluteal pain as a result of the accident (AR 155). Between December 1997 and July 2002, Dr. Thomas prescribed various pain medications, administered epidural injections, and recommended physical therapy (AR 125-156). A cervical MRI conducted in December 1997 showed a midline to slightly right paracentral disc herniation at C3-4, and a diffuse bulge and left paracentral disc herniation at C6-7 (AR 153-154). A lumbar MRI showed a subligamentous midline and bilateral disc herniation at L4-5 (AR 153). Although Robinson reported some improvement in her symptoms following a nerve root block on July 5, 2002, she requested a surgical consultation (AR 126).

Upon referral by Dr. Thomas, Robinson was evaluated by Matt El-Kadi, M.D., Ph.D., a neurosurgeon, on July 25, 2002 for complaints of cervical and lumbar pain (AR 168-170). Robinson complained of cervical pain which radiated into both her shoulder areas, down her left upper extremity and into the occipital area causing headaches (AR 168). She also complained she dropped things with her left hand (AR 168). Dr. El-Kadi noted that a lumbar MRI conducted on May 3, 2002 showed a disc bulging at L3-4 and L4-5, with some stenosis at L4-5 (AR 169). A cervical MRI conducted on July 15, 2002 demonstrated a large herniated disc at the C6-7 area paramedian to the left causing foraminal stenosis, a small central disc protrusion at the right C4-5 area, and a cental disc protrusion at the C3-4 area with mild right foraminal stenosis (AR 169).

On physical examination, Dr. El-Kadi found Robinson's bilateral muscle strength was 5/5 in all major muscle groups (AR 169). He noted decreased sensation over the left ulnar aspect,

into the first and second fingers and in the palm of the left hand (AR 169). Dr. El-Kadi considered Robinson's cervical symptoms much worse than her lumbar symptoms, and not likely to respond to conservative treatment (AR 169-170). He recommended surgery of the C6-7 area of the cervical spine (AR 170).

Robinson underwent surgery to repair her herniated cervical disc at C6-7 on October 2, 2002 (AR 158-163). Her postoperative course was unremarkable, and she was discharged the next day with prescriptions for Vicodin and Valium (AR 162).

Robinson returned to Dr. El-Kadi on October 24, 2002 for follow-up (AR 171). She stated that she felt eighty-five percent improved compared to her preoperative status and that her left upper extremity pain had improved fifty percent (AR 171). Dr. El-Kadi reported that she ambulated with a steady gate, motor strength testing of her upper extremities revealed no motor deficits, and physical examination revealed a well healed incision (AR 171). Dr. El-Kadi opined that he was pleased with Robinson's postoperative progress, and requested Dr. Thompson obtain cervical spine x-rays for his review (AR 171). Cervical spine x-rays conducted on October 29, 2002 showed postoperative changes of anterior spinal fusion at the C6-7 level and were otherwise normal (AR 177).

On December 26, 2002, Robinson was seen by Dr. Thomas and reported some improvement in her neck, shoulder and arm pain since surgery (AR 195). She complained of increased back and bilateral sacral pain (AR 195). On physical examination, Dr. Thomas reported that her vital signs were stable and she had a fair cervical range of motion with a well healed neck scar (AR 195). She exhibited pain across the lower back at the L4-5 level, with increased pain on flexion at seventy to eighty degrees and extension at ten to twenty degrees (AR 195). She was assessed with improved cervical radicular complaints since surgery and continued L4-5 radicular complaints (AR 195). Dr. Thomas administered a lumbar spine injection for her complaints of low back pain (AR 195).

Robinson returned to Dr. Thomas on January 27, 2003 noting pain in the right cervical

area and right shoulder (AR 225). Dr. Thomas found tender trigger points along the right paracervical and scapular border, with positive jump signs on palpation (AR 225). Robinson had a fair cervical range of motion, with fair shoulder girdle and arm strength (AR 225). Dr. Thomas administered trigger point injections (AR 225).

Pursuant to the request of the Commissioner, Robinson underwent a consultative examination on February 25, 2003 performed by John Kalata, D.O. (AR 197-206). Dr. Kalata noted that she had a very slow gait (AR 197) She reported an onset of neck pain radiating to her shoulders and upper arms and lower back pain radiating to her lower extremities following an automobile accident in 1997 (AR 197; 199). She indicated that prior to her cervical surgery, she had an eight to nine pain response, and after surgery, it dropped slightly to a seven (AR 197). Robinson relayed that diagnostic studies revealed a bulging disc at the L3-4 and L4-5 levels, with some stenosis at the L4-5 level (AR 197). On physical examination, Dr. Kalata reported that Robinson could not raise her arms over 120 degrees and had discomfort on raising her legs during the straight leg raising test (AR 200). He found tenderness in the cervical area with restricted motion, and tenderness in the lumbar area (AR 200). She had 5/5 motor power and a stable station and gait (AR 201). Dr. Kalata's impressions were, *inter alia,* status post cervical disc herniation surgery, residual pain, discogenic disease of the lumbar spine with radiculopathy to both lower extremities and cervical spondylosis (AR 200).

Dr. Kalata assessed Robinson's ability to perform work-related physical activities (AR 205-206). He opined that she could lift and carry two to three pounds frequently and ten pounds occasionally; stand and/or walk for one hour or less and sit for four hours during an eight-hour workday; and was limited in her pushing and pulling ability with her arms and legs (AR 205). Dr. Kalata further opined that she could never stoop, crouch or balance, but she could perform postural movements such as bending, kneeling and climbing on an occasional basis (AR 206). She had limitations with respect to reaching, feeling and seeing, and had some environmental restrictions (AR 206).

4

On March 13, 2003, Robinson returned to Dr. Thomas and complained of lower back and cervical pain, with some right leg complaints (AR 224). On physical examination, Dr. Thomas noted mild tenderness along the paracervical region on the right, with fair cervical spine range of motion (AR 224). Tenderness was noted at the L4-5 level of the lumbar spine, particularly on the right (AR 224). Dr. Thomas reported that Robinson's cervical surgery had been successful (AR 224). He assessed her with mild cervical spasms, as well as right radicular complaints, and administered a lumbar spine injection (AR 224).

On March 27, 2003, Gregory Mortimer, M.D., a non-examining state agency reviewing physician, reviewed the medical evidence of record and completed a Residual Functional Capacity Assessment form (AR 208-218). Dr. Mortimer concluded that Robinson could lift and/or carry ten pounds occasionally and less than ten pounds frequently; could stand, walk and/or sit for at least two hours and sit for about six hours in an eight-hour workday; was unlimited in her pushing and pulling abilities; could never crawl and climb ladders, ropes or scaffolds, but could occasionally climb ramps/stairs, balance, stoop and crouch (AR 209-210). Dr. Mortimer opined that Dr. Kalata's findings in February 2003, as well as the other objective evidence, did not support the restrictions imposed in his assessment (AR 218).

Robinson returned to Dr. Thomas on April 25, 2003 complaining of intermittent pain into the cervical region, as well as lower back and right leg pain (AR 223). She exhibited left and right lateral rotation to forty degrees, cervical flexion and extension to fifteen degrees, and had good shoulder girdle and arm strength (AR 223). Robinson had mild discomfort across the lower back and toward the right sacrum, trace favoring of right gastrocnemius strength, and dorsi flexion with mild decrease in the heel reflex (AR 223). Dr. Thomas assessed Robinson with residual cervical spasm and pain post spine surgery, with some intermittent L5 radiculopathy (AR 223). He recommended that she continue strengthening both cervical and girdle support, and suggested she consider a surgical opinion regarding her continued radiculopathy despite intermittent epidural injections (AR 223).

On August 8, 2003, Dr. Thomas found Robinson's vital signs were stable, she had a full cervical spine range of motion, and good shoulder girdle and arm strength (AR 222). She exhibited some pain across her lower back with sensory complaints in both calves (AR 222). Dr. Thomas assessed her with persistent L4-5 herniation with some L-5 root symptoms (AR 222).

On September 4, 2003, Robinson was again evaluated by Dr. El-Kadi with respect to her complaints of lower back pain (AR 235-236). Dr. El-Kadi noted that he had last seen her eleven months earlier when her condition was eighty-five percent improved (AR 235). Robinson reported that she suffered from back pain which radiated into the bilateral lower extremities with numbness and tingling from the anterior and lateral thighs to the knees (AR 235). She claimed that epidural injections administered by Dr. Thomas had failed to provide any long term relief (AR 235). Dr. El-Kadi reviewed a lumbar MRI dated August 25, 2003 which showed evidence of a central disc protrusion at the L4-5 level with degenerative disc disease (AR 235). He found no evidence of neuromuscular deficit on physical examination (AR 235). Based upon a review of Robinson's MRI, Dr. El-Kadi opined that surgery was not warranted (AR 235). He advised Robinson that she pursue a comprehensive physical rehabilitative/pain management-type program (AR 235).

Robinson was also treated by Mary A. Wendel, D.O., her primary care physician, from February 2000 through the relevant time period (AR 176-193; 226-234). These progress notes reflect that Dr. Wendel treated Robinson for a variety of complaints, such as *inter alia,* yeast infections, high blood pressure, cholelithiasis, GERD, dehydration, sinusitis, and urinary tract infections (AR 176-193; 226-234). Although Robinson intermittently complained of neck and/or back pain, these notes reflect that Dr. Wendel did not treat her for these complaints since she was followed by Dr. Thomas and/or Dr. El-Kadi (AR 176-193; 226-234).

Finally, Robinson submitted two reports from Dr. Wendel post-hearing (AR 238-240). On December 10, 2003, Dr. Wendel opined that Robinson could occasionally lift and carry two to three pounds; stand and/or walk for somewhere between one and five hours in an eight-hour

workday; sit for three hours during an eight-hour workday; and was limited in her pushing and pulling ability (AR 238). She further opined that Robinson could occasionally bend but could never kneel, stoop, crouch, balance or climb; had limited ability to reach and handle; and should avoid exposure to vibration (AR 239).

On March 11, 2004, Dr. Wendel reported that Robinson had persistent neck and back problems with numerous complaints of pain (AR 240). She stated that Robinson had tried multiple medications and injections in an attempt to alleviate her pain, but had weaned herself off the medications due to the side effects she had experienced (AR 240). Dr. Wendel reported that she was quite disgruntled secondary to persistent pain, and had decided against further surgery or injections (AR 240).

Robinson and Fred Monaco, a vocational expert, testified at the hearing held by the ALJ on March 10, 2004 (AR 247-271). Robinson testified that she suffered from constant pain in her neck and lower back, shoulder pain, and headaches a couple of times per day (AR 254-255). She further testified that she experienced pain in her right leg a couple of times per week for which she wore a brace (AR 254). She claimed that her neck pain however, had subsided some since her surgery, but she still wore a neck brace approximately three times per week (AR 254; 265). She testified that she wore a back brace at night to sleep (AR 265). According to Robinson, medication took the edge off her pain, but caused problems with her stomach, caused memory loss and fatigue (AR 257-258). She claimed she had trouble holding on to objects and things just slipped out of her hands (AR 264).

Robinson further testified that she was unable to turn her head around to look behind her, could not perform work with her arms raised above her shoulders or in front of her, could only lift approximately two to five pounds, stand for approximately 45 minutes before she needed to sit down, sit for approximately 45 minutes, and walk one block (AR 255-257; 263). Although she was able to drive, her sister or daughter normally drove since she was unable to look back and forth or reach out in front of her (AR 264). Robinson testified that she had not undergone

recommended physical therapy due to a lack of insurance (AR 262).

The ALJ asked the vocational expert if work existed for an individual of Robinson's age, education, and work history, who was able to perform work that did not require exertion above the sedentary level or more than occasional balancing, stooping, crouching or kneeling, that required no climbing or crawling, and that allowed such individual to alternate sitting and standing (AR 268). The vocational expert testified that such an individual could perform work as a surveillance system monitor, cashier and document preparer (AR 268). The vocational expert further testified however, that such individual would not be able to work if she could only stand and walk up to one hour or less in an eight-hour day and sit for approximately four hours (AR 278-279).

Following the hearing, the ALJ issued a written decision which found that Robinson was not entitled to a period of disability or disability insurance under the Act (AR 13-19). Robinson's request for review by the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 5-8). She subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).[2] The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. Here, the ALJ resolved Robinson's case at the fourth step. He determined that Robinson's degenerative disc disease was a severe impairment, but determined at step three that she did not meet a listing (AR 15). The ALJ found that she had the residual functional capacity to perform work that did not require exertion above the sedentary level or more than occasional balancing, stooping, crouching or kneeling, with no climbing or crawling, and that allowed the alternating of sitting and standing (AR 15). At the final step, the ALJ determined that Robinson could perform the jobs cited by the vocational expert at the administrative hearing (AR 17). The ALJ additionally determined that Robinson's complaints concerning her limitations were not entirely credible (AR 18). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

### A. Whether the ALJ erred in relying on the HALLEX manual in denying Plaintiff's request for a supplemental hearing

---

[2] In order to be entitled to DIB under Title II, a claimant must additionally establish that her disability existed before the expiration of her insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Robinson satisfied the insured status requirements of the Act through the date of his decision (AR 18).

9

Robinson first argues that the ALJ failed to comply with HALLEX I-2-5-56(A)[3] in denying her request for a supplemental hearing based upon Dr. Wendel's assessment submitted after the administrative hearing. As previously indicated, Dr. Wendel concluded that Robinson could only lift or carry two to three pounds occasionally; stand and/or walk for somewhere between one and five hours in an eight-hour workday; sit for three hours during an eight-hour workday; was limited in her pushing and pulling ability and reaching and handling ability; and could occasionally bend but never kneel, stoop, crouch, balance or climb (AR 238-239). Robinson claims that "new" hypothetical questions were necessary based upon Dr. Wendel's assessment. We disagree.

The operative HALLEX provision provides that the ALJ may identify the need for vocational expert evidence after the administrative hearing in certain situations. For example, the claimant may submit evidence after the hearing which establishes the existence of another severe impairment which raises issues that require vocational expert testimony at step five of the sequential evaluation process. Alternatively, the ALJ may determine that additional vocational expert testimony is necessary when the evidence submitted after the hearing indicates that the claimant's functional limitations differ from those covered in the hypothetical question to which the vocational expert responded at the hearing. HALLEX I-2-5-56(A).

Robinson's reliance on the cited provision does not mandate a supplemental hearing in this case. The first example is not applicable in this case; Dr. Wendel does not identify the existence of another severe impairment that would impact step five of the sequential evaluation process. Robinson's reliance on the second example is unavailing, since the ALJ rejected Dr.

---

[3]HALLEX is the Hearings, Appeals and Litigation Law manual of the Social Security Administration. It contains "guiding principles, procedural guidance and information" to the agency's Office of Hearings and Appeals, and it "also defines procedures for carrying out policy and provides guidance" for administrative processing and adjudication of claims at the ALJ, Appeals Council and court review levels. HALLEX I-1-0-1.

Wendel's assessment of her functional limitations (AR 16).[4] The ALJ specifically considered Robinson's request for a supplemental hearing, but denied her request concluding that the residual functional capacity assessment adopted was consistent with the other medical evidence, including Dr. Wendel's own treatment notes (AR 13). In light of the fact that Dr. Wendel's assessment had no impact on the hypothetical question which the ALJ posed to the vocational expert at the administrative hearing, we find no error in this regard.

### B. Whether the ALJ erred in classifying Plaintiff as a "younger person"

Robinson next argues that the ALJ erred in classifying her as a "younger person" pursuant to 20 C.F.R. § 404.1563(c). A "younger person" is a person "under age 50." 20 C.F.R. § 404.1563(c). Robinson acknowledges that she was forty-nine years old on the date of the ALJ's decision, but claims that the ALJ should have classified her as a "person closely approaching advanced age," i.e., "age 50-54." 20 C.F.R. § 404.1563(d). That age category, combined with her remaining vocational factors, would have entitled her to a determination of disability.

The Commissioner's regulations state that the age categories will not be mechanically applied in a borderline situation. 20 C.F.R. § 404.1563(b).[5] Rather, if a claimant is within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that a claimant is disabled, the ALJ considers whether to use the older age category after evaluating the overall impact of all the factors in a claimant's case. *Id*.

Here, the ALJ acknowledged that Robinson would turn fifty years old on December 19,

---

[4]We recognize that Robinson challenges the ALJ's rejection of Dr. Wendel's assessment. However, for the reasons discussed later in this opinion, we find no error in the ALJ's evaluation of Dr. Wendel's assessment.

[5]Robinson cites *Kane v. Heckler*, 776 F.2d 1130, 1132-33 (3rd Cir. 1985) in support of her contention that the ALJ mechanically applied the grids in this case. The facts in *Kane* are distinguishable however, since unlike the claimant in *Kane*, Robinson was not within days of her fiftieth birthday, and the unlike the ALJ in *Kane*, the ALJ here fully addressed the age regulation.

2004, and engaged in the "sliding scale" approach utilized in borderline situations.  HALLEX II-5-3-2.  Under this approach, the claimant must show progressively more additional vocational adversities to support the use of the higher age.  *Id*.  Examples of vocational adversities include: the presence of an additional impairment which infringes upon, without substantially narrowing, a claimant's remaining occupational base; the claimant is barely literate in English; the claimant has only a marginal ability to communicate in English; or the claimant has a history of work experience in an unskilled job in one isolated industry or work setting, such as fishing or forestry.  *Id*.

Utilizing the sliding scale approach, the ALJ found that Robinson was a high school graduate and had not worked in an isolated industry (AR 17).  He further found that she had not shown an additional impairment that infringed upon her occupational base (AR 18).  Because these findings are supported by substantial evidence, we find no error in the ALJ's decision to classify Robinson as a "younger person" for purposes of determining whether there were a significant number of jobs in the national economy that she could perform in light of her work restrictions, vocational factors and age.

### C. *Whether the ALJ erred in his RFC determination*

Robinson further challenges the ALJ's residual functional capacity assessment ("RFC").  The ALJ found that Robinson could perform work that did not require exertion above the sedentary level or more than occasional balancing, stooping, crouching or kneeling, with no climbing or crawling, and that allowed the alternating of sitting and standing (AR 15).  She contends that this finding is conclusory and that the ALJ erred in failing to address all of the relevant evidence in the record.

We first note that an ALJ must consider all relevant evidence when determining an individual's residual functional capacity.  *See* 20 C.F.R. § 404.1545(a); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3rd Cir. 2000).  "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her

impairment(s).'" *Burnett,* 220 F.3d at 121, quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3rd Cir. 1999); *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 416.927(e)(2). Social Security Ruling ("*SSR*") 96-5p provides:

> The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of the evidence.

*SSR* 96-5p (1996), 1996 WL 374183 *5.

Consideration of all relevant evidence however, does not mean that the ALJ must explicitly refer to each and every finding contained in a report. *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3rd Cir. 2001) (ALJ not required to discuss every treatment note). Moreover, the failure of an ALJ to cite specific evidence does not necessarily establish that such evidence was not considered. *Phillips v. Barnhart*, 91 Fed.Appx. 775, 777 n.7 (3rd Cir. 2004); *Lozada v. Barnhart*, 331 F. Supp. 2d 325, 336 (E.D.Pa. 2004). Indeed, requiring an ALJ to exhaustively address each and every finding in the record would prove too burdensome. As long as the ALJ "articulates at some minimum level [his] analysis of a particular line of evidence," a written evaluation of every piece of evidence is not required. *Phillips*, 91 Fed.Appx. at 777 n.7.

We find that the ALJ evaluated all of the relevant evidence consistent with the above standards. A review of his decision reveals that he evaluated the objective medical evidence, the examining physicians' opinions, and Robinson's credibility in fashioning her RFC (AR 15-16). We conclude, contrary to Robinson's contention, that the ALJ did not improperly focus on any one finding to the exclusion of others. The ALJ's decision reflects that the ALJ recognized that Dr. Thomas had been her treating physician since 1997 (AR 15). The ALJ observed that a December 1997 MRI showed degeneration in the cervical spine, but that her complaints of pain had improved in March 1998 (AR 15). He noted that in December 2002, Dr. Thomas found fair

range of cervical motion studies, but increased pain upon flexion and lumbar extension, and administered another injection (AR 15). Finally, the ALJ observed that in August 2003, Dr. Thomas found intermittent cervical pain and increased lower back and leg complaints, but she had full range of cervical motion studies (AR 16). We therefore find no error in this regard.

We also reject Robinson's claim that the ALJ failed to accord proper weight to the opinion of Dr. Wendel, her family physician. It is well settled in this Circuit that the opinion of a treating physician is entitled to great weight and can only be rejected on the basis of contrary medical evidence. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988). An ALJ must articulate in writing his or her reasons for rejecting such evidence. *Cotter v. Harris*, 642 F.2d 700, 705 (3rd Cir. 1981). In the absence of such an indication, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Id*. Further, "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3rd Cir. 1993). Finally, a treating source's medical opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(d)(2).

Dr. Wendel concluded that Robinson could occasionally lift and carry two to three pounds; stand and/or walk for somewhere between one and five hours in an eight-hour workday; sit for three hours during an eight-hour workday; and was limited in her pushing and pulling ability (AR 238). She further opined that Robinson could occasionally bend but could never kneel, stoop, crouch, balance or climb; had limited ability to reach and handle; and should avoid exposure to vibration (AR 239). The ALJ found that Dr. Wendel's office notes essentially reflected routine office visits and that Dr. Wendel failed to cite to clinical records in support of her conclusion (AR 15-16). *See Mason*, 994 F.2d at 1065 ("Form reports in which a physician's

obligation is only to check a box or fill in the blank are weak evidence at best."). The ALJ also noted that while Dr. Wendel's treatment records provided a reasonable basis for her findings of pain and some limitation in motion, Robinson's examination results did not rule out sedentary work (AR 16). Finally, we observe that Dr. Wendel's opinion is inconsistent with the other medical evidence of record as discussed below.

The record reflects that less than one month after surgery, Robinson reported an eighty-five percent improvement in her condition, and cervical spine x-rays were normal (AR 171, 177). Following her surgery, she complained of only intermittent cervical pain, and by August 2003, she exhibited full cervical spine range of motion, good shoulder girdle, and good arm strength (AR 222-223). As noted by the ALJ, while an August 2003 MRI showed a central disc protrusion at the L4-5 level, Dr. El-Kadi found no neuromuscular deficits on physical examination (AR 235). Based upon a review of her MRI, Dr. El-Kadi opined that surgery was not warranted, and recommended a physical rehabilitation/pain management program (AR 235). There is no indication in the record that Robinson ever followed through with Dr. El-Kadi's recommendation. Finally, Dr. Wendel's report dated March 2004 indicated that Robinson had weaned herself off pain medications, albeit due to side effects, but she also had decided against further surgery or injection therapy (AR 240).

We also find that the ALJ did not err in according only limited weight to Dr. Kalata's opinion. Dr. Kalata opined that Robinson was limited to lifting and carrying two to three pounds frequently and ten pounds occasionally; could stand and/or walk for one hour or less in an eight-hour day; was limited in her pushing and pulling ability with her arms and legs; could never stoop, crouch or balance, but could perform postural movements such as bending, kneeling and climbing on an occasional basis (AR 205-206). Robinson claims that the ALJ erred in according Dr. Kalata's opinion limited weight, since it is similar to Dr. Wendel's opinion and essentially negates her ability to perform sedentary work with certain restrictions.

We first note that the treating physician rule does not apply to a consulting physician's

opinion. *Mason*, 994 F.2d at 1067 (doctrine had no application to physician who examined claimant once). Nonetheless, the Commissioner's regulations provide that the ALJ must consider the extent to which the opinion is supported by a logical explanation, the degree of the medical source's specialization in a relevant field, and the extent to which the source's opinion is consistent with the entirety of the evidence. *See generally* 20 C.F.R. § 404.1527(d)(1)-(6).

The ALJ here evaluated Dr. Kalata's opinion consistent with the above standards. The ALJ considered Dr. Kalata's reported findings based upon his physical examination of Robinson, and noted that his examination was performed only four months post-surgery when some residual effects were to be expected (AR 16). He examined Dr. Kalata's opinion in light of the remaining treating physicians' opinions and concluded that his examination did not rule out a reduced range of sedentary work (AR 16). Specifically, he noted Dr. El-Kadi's findings of eighty-five percent improvement within one month of surgery, and that Robinson had no neuromuscular deficits in September 2003 (AR 16). He further noted Dr. Thomas' findings of improvement in December 2002, with a full range of cervical motion in August 2003 (AR 16). All of these findings (without repeating such findings here) are supported by the record, and, consequently, we find no error in this regard.[6]

### D.     *Whether the ALJ erred in his credibility determination*

Finally, Robinson challenges the ALJ's credibility determination. An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 20 C.F.R. § 404.1529(a). Subjective complaints must be seriously considered, whether or not they are fully confirmed by the objective medical evidence. *See Smith v. Califano*, 637 F.2d 968 (3rd Cir. 1981). The ALJ as the finder of fact can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *Baerga v. Richardson,* 500 F.2d

---

[6]Parenthetically, we observe that Dr. Kalata's findings were not entirely consistent with his RFC assessment. While he found Robinson had some tenderness in the cervical and lumbar area, she nonetheless exhibited 5/5 motor power and a stable station and gait (AR 201).

309, 312 (3rd Cir. 1974).  The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court.  *See Van Horn v. Schweiker*, 717 F2d 871, 873 (3rd Cir. 1983).

Robinson claims that the ALJ failed to adequately explain why he believed her testimony was not credible.  We disagree.  The ALJ found that Robinson's testimony regarding her physical limitations was not consistent with the medical findings or her self-reported activities of daily living (AR 16).  The ALJ noted that her degenerative back condition provided a reasonable basis for pain, but not for pain so severe that even sedentary work was ruled out (AR 16).  Finally, the ALJ found that she was able to engage in many household activities, although with difficulty (AR 16).  The ALJ's RFC assessment fully accommodated Robinson's subjective complaints and limitations relative to her impairments.

## IV. CONCLUSION

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TAMMY S. ROBINSON,                )<br>                                                     )<br>            Plaintiff,                         )<br>                                                     )<br>      v.                                         )   Civil Action No. 06-6 Erie<br>                                                     )<br>JO ANNE B. BARNHART,         )<br>Commissioner of Social Security,  )<br>                                                     )<br>            Defendant.                     ) | |

## **ORDER**

AND NOW, this 19th day of October, 2006, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 8] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 13] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against Plaintiff, Tammy S. Robinson. The clerk is directed to mark the case closed.

                                                                            s/ Sean J. McLaughlin
                                                                            United States District Judge

cm: All parties of record.